GLEMON RAY MOSS v. C. G. TATE, Trading as C. G. TATE CONSTRUCTION COMPANY.

(Filed 2 June, 1965.)

1. **Trial § 21—**

   Defendant's evidence in conflict with that of plaintiff, or which tends to show facts at variance with plaintiff's evidence, is not to be considered on motion to nonsuit.

2. **Highways § 7— Where evidence shows that barricade causing injury was made and placed by Commission, nonsuit of highway contractor is proper.**

   Plaintiff's evidence was to the effect that he was proceeding along a highway, the center line of which had been obliterated by resurfacing, when he was forced partly off the highway to his right by oncoming vehicles, that the lights of these vehicles blinded him, and that when they had passed he for the first time saw a barricade on the shoulder, extending to within ten or twelve inches of the hard surface, and that when he swerved left to miss this barricade, he lost control, resulting in the injury in suit. Plaintiff alleged that defendant, in connection with its construction of a by-pass converging with the highway, had placed the barricade across a part of the hard surface of the by-pass and on the shoulder of the highway, but all of the evidence was to the effect that the barricade was made and placed by the Highway Commission and not defendant. *Held:* Defendant's motion for nonsuit was properly allowed.

Appeal by plaintiff from *Bundy, J.,* September 1964 Session of Nash.

Plaintiff's action is to recover for personal injuries and damage to his pickup truck allegedly caused by the negligence of defendant.

Plaintiff's injuries and damage were caused by a mishap that occurred on U. S. Highway No. 64, approximately 1.34 miles west of Nashville, at or about 10:45 p.m., on December 25, 1962.

Plaintiff had been employed for "about three weeks" as a clerk in Langley's Superette, a general country store located between Nashville and Rocky Mount. He went to his work at Langley's Superette on December 25, 1962 about 2:00 p.m. When the mishap occurred plaintiff, alone in his pickup truck, was driving in a westerly direction toward his home in Spring Hope.

Plaintiff alleged he was "completely blinded" by the "bright headlights" of two motor vehicles approaching from the opposite direction which "appeared to be or were" in plaintiff's lane of travel; that "to avoid a head-on collision" plaintiff drove "to his right and partly onto the Northern shoulder of said highway"; that, when the lights of the approaching vehicles had passed, plaintiff noticed for the first time "an unlighted large wooden barricade *which had been placed by the defendant* within ten or twelve inches of the Northern edge of the hardsurfaced portion of said highway"; and that, to avoid colliding with the barricade and wrecking his truck, plaintiff pulled to his left and, "due to the conditions of the highway at that point," his truck "turned over," causing injuries to plaintiff and damage to his truck. (Our italics.)

Under its contract of September 1961 with the North Carolina State Highway Commission, defendant was obligated to construct and complete a project in Nash County for "the relocation of U. S. Highway 64 from a point approximately 1.34 miles West of Nashville, Easterly, around the North side of Nashville, to Rocky Mount," and on December 25, 1962 "was in the process of carrying out the terms" of said contract.

The pleadings raise issues as to negligence, contributory negligence and damages. Evidence was offered by plaintiff and by defendant. At the conclusion of all the evidence, the court, allowing defendant's motion therefor, entered judgment of nonsuit. Plaintiff excepted and appealed.

*Valentine & Valentine for plaintiff appellant.*
*Battle, Winslow, Merrell, Scott & Wiley for defendant appellee.*

Bobbitt, J. Only one question is presented: Was the evidence, when considered in the light most favorable to plaintiff, sufficient to require submission to the jury?

Under its contract of September 1961 with the State Highway Commission, defendant had been engaged "for many months" in the construction of the Nashville bypass, referred to hereafter as the bypass or "new 64." On December 25, 1962, the bypass west of Nashville had been paved but was not open to traffic.

The bypass and U. S. Highway No. 64, referred to hereafter as #64 or "old 64," converged approximately 1.34 miles west of Nashville. At said point of convergence, going east, #64 continued straight and the bypass diverged to the (left) north. The "V" or "fork" between said roads near said point of convergence was to the right (north) of approaching westbound motorists.

Plaintiff testified the barricade was located "about 20 or 25 feet from the peak of the corner made by old 64 coming together with the new 64," the south end being "within 10 or 12 inches of the hard surface" of "old 64." Edwards, plaintiff's witness, testified the barricade was "close to the intersection of those two roads."

All the evidence tends to show the barricade extended partway across "new 64"; that its sole purpose was to warn eastbound motorists that "new 64" was not open to traffic; and that there were no lights, reflectors or warnings of any kind "on the back side of that barricade."

According to Fleming, defendant's witness, who was the State Highway Commission's Resident Engineer, this was "a standard barricade erected at the beginning-end of the project, which was the West end of the bypass." He described it as follows: "The barricade consisted of three reflectorized boards attached to an upright frame with a 'Road Closed' sign bolted to the middle board. These boards are approximately 8 feet long with black and yellow cross-hatchings across the boards with beaded points applied to them to reflect lights. When an automobile's headlights strike these boards at night, it lights like a Christmas tree. In the middle of this thing, bolted to the center board, we had a 'Road Closed' sign. The whole unit stands approximately 5 feet high." Suffice to say, there is no evidence or contention that the barricade failed to give adequate warning to eastbound motorists of its presence and purpose.

Plaintiff knew "the area" was under construction, that "the shoulders had just been built," and that the shoulders "were soft with right much rain." Each day, during the three weeks preceding December 25, 1962, plaintiff had made a round trip between his home in Spring Hope and Langley's Superette. Approximately ninety per cent of these trips were made on #64. He had noticed the barricade each time he passed. The last time he passed was about 2:00 p.m. on December 25, 1962. Previously, while traveling west on #64, he had noticed eight or ten "Soft Shoulders" signs during the last quarter of a mile before reaching the convergence of #64 and the western terminus of the bypass.

There was no center line on #64 at the time of plaintiff's mishap. There had been "a center line along there before the recent application of tar and asphalt." The "blacktop" on this part of the highway "had

been newly sprayed not too many days before and . . . was real black."

Plaintiff guessed the width of #64 was "about 20 feet." Wheeler, defendant's witness, who was the investigating State Highway Patrolman, testified: "The width of the paved surface that night of the old U. S. Highway 64 was 24 feet."

As to what occurred at the time of his mishap, plaintiff testified: "I could see them (the approaching trailer-truck and car) 400 or 500 yards. I could see the lights. . . . Those lights were very bright. I did not continue to drive along at 35 miles per hour, but slowed down when I met the truck. I imagine I slipped off during the time before I got past the truck. It was a long truck. I didn't just slam on brakes all at once. I was going to follow it on out because I knowed the shoulders was soft and I knew when I slipped off, and I knowed if I pulled back on probably what would happen, but there was that barricade sitting right in front of me when I got past the truck." Again: "When I went off the road the first time, I went off on my right side. When I pulled back . . . when I cut to my left on the blacktop, my truck went in a spin and threw me out and the truck turned over and was headed right back up facing the highway just like it was coming in off a side road. After the truck came to a stop, it was on the south side of the highway."

According to Edwards, plaintiff's truck, when it came to rest on the south shoulder, was "almost opposite the barricade."

Plaintiff testified: "So far as I know, the truck never got on my side of the road. Insofar as I know, the car never got on my side of the road."

There is no evidence or contention that plaintiff's truck struck any part of the barricade. All the evidence tends to show it did not do so.

The evidence is silent (1) as to the width of the north shoulder of #64, (2) as to how much of plaintiff's truck actually got on the north shoulder of #64, and (3) as to the distance between these two converging roads at the point where the barricade was located.

There is no evidence as to the identity of the oncoming truck-trailer and car referred to in plaintiff's testimony or as to the driver of either.

We do not set forth Wheeler's testimony tending to show (1) that the place on the south shoulder where plaintiff's pickup came to rest was 100-150 feet east from the intersection of "old 64" and "new 64," (2) that tire marks "extended from the pickup back to the East for a distance of 75 feet to this shoulder on the North side of the highway," and (3) that plaintiff when interviewed, both at the scene of the mishap and later, made no reference to the barricade. This testimony, being in conflict with plaintiff's evidence, must be disregarded when considering the motion for judgment of nonsuit.

"In ruling upon a motion for an involuntary judgment of nonsuit under the statute after all the evidence on both sides is in, the court may consider so much of the defendant's testimony as is favorable to the plaintiff or tends to clarify or explain evidence offered by the plaintiff not inconsistent therewith; but it must ignore that which tends to establish another and different state of facts or which tends to contradict or impeach the testimony presented by the plaintiff." *Bundy v. Powell,* 229 N.C. 707, 711, 51 S.E. 2d 307; Strong, N. C. Index, Trial § 21.

It is asserted in plaintiff's brief that the gravamen of his action *"is the positive act of the defendant* in placing the unlighted and invisible five-foot high barricade within ten inches of the northern edge of the hard surface of Old Highway 64 at the intersection with the bypass directly in the path of the plaintiff and any other user of the said highway who might have been forced to take refuge on the shoulder of the highway." (Our italics.)

Defendant admitted plaintiff's allegations that his contract of September 1961 with the State Highway Commission imposed upon him certain obligations with reference to barricades and warnings in connection with the work covered by said contract. However, there is no evidence or contention that defendant was negligent in any respect in connection with his work on the bypass or in warning the public of hazards in connection therewith. Plaintiff's mishap did not occur on the bypass.

Unquestionably, there devolved upon defendant, under his contract with the State Highway Commission, the positive legal duty "to exercise ordinary care for the safety of the general public traveling over the road on which he was working." *Council v. Dickerson's, Inc.,* 233 N.C. 472, 475, 64 S.E. 2d 551, and cases cited.

It is noted that defendant's said contract with the State Highway Commission is not in evidence. Defendant's superintendent on the "Nashville bypass" job testified: "The defendant as a part of this job had resurfaced or re-blacktopped that road about a month or so prior to the accident. This resurfacing was done by a subcontractor. We were the prime contractor and the resurfacing rubbed out the center line of the road or covered the center line of that road, that is, 64 West of Nashville." He testified further: "The Highway Department had the duty to reline old 64 after it was resurfaced." He also testified: "The shoulders at the West end of the bypass and old 64 had been at that time roughed in. The dirt had been hauled but it wasn't grassed yet. We had to prepare it for grassing." In this connection, it is noted that the condition of the north shoulder of #64, of which plaintiff was fully aware, is not an alleged cause of plaintiff's mishap. Too, it does not

appear that defendant had any further obligation in connection with #64.

Fleming testified: "With respect to the Nashville bypass, in December 1962, I was in direct charge of the construction of that particular project at that time." After describing the barricade as set forth above, he testified further: "During the times that I made my inspections during the month of December 1962, and with respect to where the barricade was located, we placed the barricade at the intersection of the new portion to the old 64 in such a manner that traffic coming from the west could readily see the sign and would be forewarned ahead of time so that they would not enter the new portion of the project." Again: "The State Highway Commission sign shop in Wilson prepared the signs and erected them."

Defendant's superintendent on the "Nashville bypass" job testified: "The State Highway Department made that barricade. The State Highway Department installed that barricade."

As stated in plaintiff's brief, the gist of plaintiff's cause of action is the fact that a portion of the barricade was on the north shoulder of #64. There is no evidence defendant had any part in constructing or locating this barricade. All the evidence is to the effect this was done by the State Highway Commission. Plaintiff has failed to establish the fact upon which all his allegations as to defendant's actionable negligence are based. For this reason, the judgment of involuntary nonsuit is affirmed. Decision on this ground renders unnecessary a discussion of other serious questions pertinent to the question of nonsuit.

Affirmed.